22-2600 Southern Iowa, Mark Nieters v. Brandon Holton et al. Ms. Messonnier, you're doing a twofer. I am. I'm glad to be on some lighter fare for this one, though. May it please the court and counsel. In this case, the district court accepted the officer's testimony and assumptions about what happened and ignored contrary evidence that would have allowed a reasonable jury to conclude that the officer was unreasonable when he tackled, pepper sprayed, and arrested a news reporter who was simply doing his job. This is a classic case of incorrectly applying the summary judgment standards. Starting with the seizure claim and why there are fact disputes that require a jury trial on that one. The district court said there was arguable probable cause, and it really came down to this fact that dispatch had reported some people, unlawful assemblers, moving down a particular street, and that's the street that Ted happened to be on. That was the main thing to the district court. But there are lots of other facts the district court didn't look at that a jury could conclude this was not enough for probable cause to arrest this man. First of all, I think we kind of have to think, this is a First Amendment background case, and there are a lot of people exercising their First Amendment rights earlier that evening, and a lot of them had left the Capitol in compliance with dispersal orders. So just as a baseline, we know there are people who are doing constitutionally protected things and who have been obeying the law and have gone and may still be somewhere in this neighborhood because we're several blocks away from the Capitol by now. But more specifically, why it was unreasonable for this officer to conclude that Ted Neters was a part of some group who'd done something wrong. Number one, proximity. He's 50 to 70 feet away from the group of people that Officer Holton supposedly was supposed to be chasing, and that's acknowledged by Officer Holton's own testimony. So there's not proximity to him and those people. Second, he's not doing the same things as those people. Those people are running away, and they're obviously together. Ted Neters is standing by himself, and he doesn't look like those people. He's carrying expensive camera equipment, he's got a helmet on, and he's just not acting like those people. Also, what he was doing immediately prior to when Officer Holton approached him, he was taking photographs of the tear gas canisters that had been thrown. He was employed in his occupation. And when Officer Holton got up to him, he put his arms up, and he said, I'm impressed, I'm not resisting. He's just clearly not one of those protesters or somebody who's doing something wrong. Counsel, is there any evidence in the record that the officer saw him taking photographs or perhaps evidence from which that inference could be made? Yes, Your Honor, I believe that would just be based on Ted Neters' testimony that that is what he was doing immediately prior. And from the videos, you can see Officer Holton was in a group of officers that got out of a car and then ran down a city block. And it was that group of officers, I believe, that deployed the tear gas canisters that Ted Neters was taking photographs of. So just based on the timeline, it was Officer Holton's group of officers who did those actions, and then Ted Neters was taking a photograph of them as Officer Holton was approaching him. So, yes, I think that's the basis that you could conclude he should have seen and been aware that he was with the press. The video sure doesn't show that, though, does it? The videos are not great. There's only one video that even closely shows the arrest. There are other officer videos that show officers running up, but they don't show the right angle to catch Ted Neters and Officer Holton. But there are other officers from the van, and you can see them running up and see the tear gas from the other perspectives. But they don't show him taking pictures. There's nothing like that. No, that would be based solely on Ted Neters' testimony. The video does show, if I recall, you can see other protesters at least in the vicinity, and I don't know if they're 50 feet, but there certainly were other protesters right in the vicinity of the camera angle anyway. I believe what the cameras show, they don't actually capture, I don't think, the group that dispatch had been talking about, because that group went around the west side of Embassy Suites. Judge Kelly is probably familiar with this area because it's right by the federal courthouse in Des Moines, so that group was already out of camera view before they got there. The other people that were still there, I'm not even sure what those people were doing. The cops arrested a lot of those people, but they weren't in a large group, and it's not clear they were protesters. Some of them were actually taken out of cars. So I have other issues with those arrests and what those people were doing, but I don't think that his proximity to any of those people showed that he was in any kind of assembly. They were smaller groups that were still kind of around in the area. And if we look at this court's case law for protest context, we've got Bernini that says it's okay to arrest a lot of people if there's a basis to think they were acting as a unit. We don't have those kind of facts here where we think there's enough to say Ted Neters was acting as a unit with some people here. There also was no effort. It was really important in Bernini that there was an effort by the officers to separate the wheat from the chaff and say, okay, were you a protester or are you just a random person? No effort was made here. And really, I wish I would have moved for summary judgment on the arrest portion because I think there are fat questions about whether the original seizure was unreasonable, but when we get to the point where he's taken him into custody, he sees his press pass, he confirms for himself these are cameras, this is a photographer, there's no basis to move forward with a seizure after that point and move forward with the arrest. Because Officer Holden acknowledged, and I think this is an objective correct thing, that he didn't know where Ted Neters had been. He didn't know if Ted Neters had heard and ignored in order to disperse at the Capitol. So there's no basis to charge him with anything once it's confirmed beyond any shadow of a doubt that he is with the press. And these principles are also recognized in the course decision in Bowd. Most recently, the Welch v. Dempsey case, which I think is maybe the first case to reach the circuit from the George Floyd protests, there was a woman in that case who was certainly surrounded by a lot of protesters closer than Ted Neters was to anyone else. And the court still said in Welch that that's not enough for probable cause. You have to have more information. This person is acting illegally with these other people. Just standing by yourself, that's not enough. And that is what Ted Neters was doing here. So based on all those fat questions, this is— it was undisputed that as the officer approached, Mr. Neters turned away from him. That segues into the excessive force claim, I think, nicely. Well, but it also—perhaps the arrest, perhaps his reason—arguable probable cause. Sure, I agree. That might make one think that he was a member of the group. He didn't have press—any press on his clothes or the word press, so to speak. That's correct. And here is where I think there is the most kind of potent factual dispute. Because in Officer Holton's testimony, he says, I approached him and I gave an order to get down, and I pepper sprayed him and tackled him at the same time. And so that's consistent with what Ted Neters says, which is, like, I was standing there, and I see I'm about to get tackled, form-tackled by this person who's running at me, and I'm holding out my camera equipment, saying I'm not resisting. But as he tackles me, I turn to just kind of protect himself, like a—I think just a reflex at the last second. And I think it's that last-second nature that makes us, like, this wasn't resisting. There's no basis for Officer Holton to say this was him running away or resisting when it's— and there are photos of it happening where he's got his hands up as he's turning. Do his feet ever move? Like, you said he's doing this. Or is that in dispute? I don't think that that's really specified in the record. The photos—his feet are planted in the photos, but I don't know exactly. I don't think that Mr. Neters testified about that. But he just said he turned. He never said he turned and ran or anything like that. So under those circumstances, I think a jury could say that wasn't a reasonable inference for the officer to draw, to say, oh, this turn right before I tackle you means you're running away, and that then somehow justifies post hoc the fact that I'm in the process of tackling you. And this all seems to have happened so quickly. And as I understood the officer's testimony, he said it was all simultaneous, which seems to me to be more kind of just all in a row, right? So is there—when does the officer say he thought he was fleeing? In other words, if it's all simultaneous, it's hard to pinpoint a moment in time between I'm coming at you and I've already decided what I'm going to do, but, oh, now I see you're fleeing. Does that make sense? In other words, I see you fleeing, now I'm coming after you, or I'm coming after you and then I see you fleeing? Yes. I don't think the officer Holton ever testified that he saw Ted Neters fleeing, and that's when he started going after him. He testified the fleeing happened. Like I ordered him to get to the ground and he turned and I perceived that as fleeing. It really was the simultaneously is the way he described it in his testimony. Maybe that's why it's a fact dispute because we just don't know what exactly happened. I agree. And certainly in his deposition, that was the way I got him to describe it was that it happened simultaneously. Maybe if he testified, he would try to draw it out more, but I think that there's enough for me certainly to cross him on that. And especially because I think that's consistent with what Ted Neters would do and said he was doing because he wasn't doing anything illegal, so why would he turn and run? And why would he wait until this last second to turn and run when this officer has been running at him for probably 100 meters now? It just doesn't really jive with common sense and with the photographs that were taken by a Des Moines Register reporter at the same time. Yeah, and in retrospect, I think you're probably right that the turning has more to do with the excessive force because I think he thought he had probable cause to arrest just based on the dispersal order and the failure to disperse potential. And this is more of a subjective issue because I think the district court was looking at, objectively, he had information that people were on this block, but subjectively, Officer Holton testified, I didn't think he was with that group. Subjectively, I just thought he was somebody who had been at the protests, and so that's why I arrested him. Counsel, I'd like to ask you about the excessive force claim and the second part of qualified immunity analysis, the clearly established prong. I'd like to know what your view is of the proper formulation of the constitutional right that's at issue. The district court seemed to state it very, very specifically. Yes, and I think too specifically. I think there are several cases saying that it's unconstitutional to pepper spray someone and then you turn to those kind of traditional gram factors of what's the severity of the crime, what's the threat, is there resistance, and is there noncompliance? And you filter those down to this particular instance. There's nothing really novel about this. How would you formulate the right? The right to be free from what? The right to be free from a pepper spraying and a tackle, to be free from force when you are a non-resistive, at most misdemeanant, who's been given no warning. I think it's that simple. And I think that this court, in recent decisions like the Partridge v. City of Benton decision and Westwater v. Church, these are just kind of standard principles that you can apply to any individual fact pattern, and there are questions of fact that a jury needs to decide if something was unreasonable or not, and this really fits into that kind of analysis. And one thing I wanted to distinguish, too, there's the Ehlers case, E-H-L-E-R-S, where the court said qualified immunity was granted where someone was tackled or taken to the ground at least after he'd been told to stop twice and then walked away from the officer, and so there was noncompliance. That's not the situation we have here. Certainly on the facts taken in the light most favorable to Ted Neters, there is a dispute about whether there was any noncompliance at all. And then briefly on the First Amendment argument, I think that this one needs to be reversed fundamentally because the district court said that the fact there was arguable probable cause defeats the First Amendment claim, and that's incorrect. The court has acknowledged that in the Welch v. Dempsey case recently and then also Green v. City of St. Louis from last year as well. So the district court didn't do the necessary analysis on that claim because it thought that that was just an automatic loser because it made that arguable probable cause decision. On the First Amendment claim, don't you have a causation problem? Well, I don't think the district court reached causation because it relied on the arguable probable cause. But, no, I don't think I do have a causation problem because, again, he was shooting photographs before being tackled, and Officer Holton was running at him from this distance, had an opportunity to observe that. He's wearing his cameras. And then, again, separately, I think there's the original seizure in there. I could state a claim based on that. But there's also the continuation of the seizure and the charges after he's been identified as press and there's no dispute that he's wearing cameras. So I think that those things could allow a jury to infer that he was seized and charged because he was working with the press and covering these protests. I'll reserve the balance of my time. Thank you. Thank you very much. Thank you. Good morning. May it please the Court? Counsel. My name is Shelley Mackel. I'm here representing the City of Des Moines and Officer Holton. As this Court knows, when we're looking at Fourth Amendment analysis, seizure, force, it's necessary to start with what's in the officer's mind at the time. And for Officer Holton, it's important to look at both the short view of what was in his mind and then the long view. We know that he was getting real-time information from dispatch through his radio. He was also aware that dispersal orders were given at the Capitol and that it was announced over the radio that a group had splintered from the Capitol and was heading west down Locust Avenue toward the embassy suites where Mr. Naders was ultimately arrested. The long view, though, is that this is the fourth night of protests that devolved into something much worse. They turned into riots in some cases, much property damage, assaults on police officers. When I say that, I mean we have hundreds of people confronting police officers and some in those groups were throwing rocks, throwing bricks. They'd pick up whatever was on the street, landscape blocks. They would throw water bottles, urine bottles, and frozen water bottles for greater impact. So this had been going on for three days. Counsel, that's all very interesting, but as I understand it, the only statute for which it's claimed there's probable cause here is 723.3, which is failure to disperse. Right. So I think that's what we need to talk about. That statute, by its plain terms, only applies to those within hearing distance of the dispersal order. Doesn't that alone preclude summary judgment here? Isn't there a fact issue about whether he was within hearing distance of the dispersal order, given that he was five blocks away? He was not five blocks away when the dispersal orders were given, Your Honor. He was at the Capitol. We know the times that the dispersal orders were given. They started at 1033. So then the question becomes, are you taking facts in a light most favorable to Neters or to the officer? Mr. Neters admits to being at the Capitol until 1045. We know that the dispersal orders were given at the Capitol at 1030 to 1045. There were five of them. And he left after they had been given. So he is at the Capitol when they're being given. My next question is, if he's five blocks away when he's arrested, standing by himself, why is there probable cause to believe he didn't disperse? And that has to do with the radio that Officer Holton is wearing, and it's part of the record. He is hearing the first time, moments after the last dispersal order is read, we have a group splintering from the Capitol going down Locust. Then they're getting live updates. Now they're at 4th Street. Now they're at 3rd Street. Now they're at 2nd Street. But my question is, haven't they dispersed? If they've left the Capitol, they've gone five blocks away, and he's standing by himself in front of the embassy suites. Why is that not dispersal? I would say that none of them dispersed. But at that point, that ship has sailed. Once they failed to leave the Capitol before that fifth order was given, then anyone who was there is subject to arrest. The opportunity to disperse is gone. So the order is to disperse? Yes. From where? The definition of disperse, I looked it up in the dictionary, is to stop being a unit, is to stop traveling together. So I think it would be a different argument if Mr. Neters had walked away somewhere five blocks where no one was. But that's not what he did. He traveled with a roving group. And he admits to that. And so that group, they have live updates. That group is now here. It's here. It's here. It's in front of the embassy suites. And that's where he is. They say, we have a large group in front of the embassy suites. There he is. And, yeah, the police show up and people scatter. Not everyone, but most did. So let me go back to my first question. On what basis would Officer Holton think there's probable cause that he was within hearing distance of the dispersal order? Well, because he believed that he was with the group that was traveling. So the district court also found that in terms of the proximity. The moment before they get out of the TAC van, they hear. There's a large group in front of the embassy suites. As soon as they exit, the team leader, Ryan Armstrong, says, we've got a group running. And so. Why would Officer Holton think that Needers was at the Capitol when the dispersal order was given? Because he was in the same proximity as the group that was moving. There are other reasons, though, too, that the district court did not take into account. I mean, I don't know how. I don't know how if you have a group of 50 people walking away, still kicking windows, still. There was an assault three blocks from. That brings up another question. I think taken in the light most favorable to Needers, he was not with the group. He was standing alone. There were about seven people standing in front of the embassy suites. There were people moving around that were not police officers. That's true. So why would the court assume that he was part of a group action? Because of the proximity to that group. He also looked the part. I want to be clear about this. The court did not rely on this, and I think that was an error. When he was spotted by Officer Holton, he didn't just look like a photographer. He had a helmet on. He had goggles on. He had a chemical grade mask on, looking like somebody who was ready for tear gas and for objects flying. I mean, that was the uniform. And so it wasn't just that he had the proximity. I think the word Officer Holton used was agitator. He appeared to be one of those who was in the position of agitating, not just participating. He didn't have probable cause to believe he was an agitator. He allegedly had probable cause to believe he had failed to disperse. Well, the role of agitator would suggest that he was participating previously where tear gas was given and where the dispersal orders were given before the tear gas was given, traveled with the group, and ended up where they landed when police showed up. So the other issue, and it is at least a consideration about the arrest, was that Officer Holton did see Mr. Nieder's turn. And Ms. Messer is correct, the video is sort of difficult, but you can plainly see, and actually their statement of facts helps with this, is that they say he turned back around. So it's my understanding that Nieder's was facing away to take pictures of the tear gas. He turns this way and then turns back around. So Holton clearly saw this, and I don't think he said that that happened simultaneously. I think he said, I saw him and then I took him down and sprayed him simultaneously. That's what he was getting at with that. He did not simply tackle spray and do all of this at the same time while also seeing him turn around. You can see there are several seconds where Mr. Nieder's is turned backward. It seems to me that he turns when he sees the officer running at him. Is that what your position is, that the officer is running at him and he turns? Yes, and he says, I saw him so I decided to brace myself. So he turned. So Holton is running toward him and sees this guy turn around and appears to be fleeing like everybody else is around the area. But isn't that a fact dispute? I mean, maybe, but if there's no testimony that he was moving his feet, it seems to me a jury could believe Nieder's that you're coming at me. I don't know if I'm brave enough just to stand and take it in the face. I think that's sort of just a natural reaction, and at least it's something for a jury to consider, to see whether it was flight or whether it was sort of just self-protection. I don't think that his reasoning is something that we should be considering when it's what's in the officer's information. So the officer is taking this in, and these are those split-second decisions that we're talking about. Nothing is more true about the situation than when you're in. Then we just believe the officer. It's what a reasonable, objective officer would believe. And so if you've got other reasons for what's going on, I'm concerned that your argument sort of just says, well, that's what the officer says, and therefore that's reasonable. But it isn't. Mr. Nieder says he turned around. That's all Officer Holton says he sees. He sees him turn around, and he perceives that to be running. And so there isn't a fact dispute. He turned around. And so the officer, the question is, is it reasonable under those circumstances, when you're in a space where everyone is running away from the police, this is seconds from when everybody's scattering, that when he turns away, is it completely unreasonable for this officer to think that he might be taking off? And I think the answer to that is no, and especially not in this kind of scenario. Because even though there are individualized reasons for, I think, Officer Holton perceiving flight and potential risk, there is also this issue of the totality of the circumstances. And I cited a case in brief which articulated basically some kinds of force may be differently used, depending on how many people you're dealing with, right? So if it's a single officer, you've got three people, he might use different force than he would use if it was one-on-one. In this situation, Brandon Holton knew that there were people on top of the parking garage right across that were a potential threat. Again, this is with this long view. Previous nights, people would drop bricks and rocks on officers from parking garages. So he's allowed to rely on some of that experience. So he's got a potential threat behind him. He's got people running everywhere that are also potential threats. And he sees Mr. Neters with what he perceived was a backpack, which was usually the vessel that carried... Let me ask you about that. For purposes of summary judgment, do we assume that the officer didn't see the cameras hanging around his neck or that he did see them? He did not see them. For purposes of summary judgment, we assume he did not see the cameras. Well, he testified that he did not see them. He thought the straps were backpacks, and that is... But the photos clearly show cameras hanging all over his body. Not from Holton's perspective. Holton was coming at his back. So we take the facts in the light most favorable to Holton. No, I just don't think it's a disputed fact. The fact that he was wearing cameras is not the same thing as Mr. Holton not seeing them. He saw straps. He admits to seeing straps. He perceived it in those seconds as a backpack. And so I, you know... First, this was the first I sort of heard that in this moment, Mr. Neters was taking photographs. But if that's the case, Brandon Holton is here approaching him this way. That means Mr. Neters is here. So he doesn't have the cameras facing Officer Holton. He has the straps that he holds over his shoulders. And so in that instance, if there's a way to say Officer Holton is lying, that he did see those kinds of evidence of having a camera, then we might be different. It's not a matter of credibility. It's a matter of the summary judgment standard. Right. And there is no issue at this point, as far as I know, with Officer Holton's credibility. And there's no evidence to show that he didn't see that. And so that's my understanding is the put-up-shut-up time during summary judgment, you've got to show the proof if you've got it. And so show me the proof that he was wrong about that. Mr. Holton. I wonder if the camera thing makes much difference. Didn't a lot of the protesters carry cameras for various reasons and take photos, maybe hoping to find police brutality or just because to document the event? Right. Well, yeah, everyone has a camera now. And so I don't think that that is sort of the crux of the issue. And that also gets to this issue of the notion that because Mr. Dieters was a member of the press, that he could break the law. And that comes through very clearly when two other reporters from the Des Moines Register, most prominent paper in the state, fully marked. They get very sternly told by Officer Ryan Armstrong, disperse means you too. I've already told you, get out of here. And so camera or not, they were still in an area where an unlawful assembly was happening. And from that perspective, it didn't matter if he was taking a picture. It didn't matter if he was, you know, if he even was completely marked by press. I believe that those two press people could have been arrested in that moment also because an unlawful assembly is traveling. It is moving down the road and they chose to associate themselves with it. And so that's that clearly established right. If you choose that after seeing assaults, if you choose that after all of the destruction that's been happening, you choose to be affiliated with that group, whether it's to take a picture or whatever it is. That's not a clearly established right. You get to break the law because you want to get good pictures. And so I'm happy to answer any other questions. Otherwise, I will close. Thank you. Thank you. I don't want to get too far sidetracked in terms of whether or not other people were doing illegal things. But I think that it does highlight this issue, what Ms. Mechel was just saying about these other reporters could have been arrested. For what? There's not even any evidence in this record that the group that disappeared around the side of Embassy Suites had done anything illegal after they left the Capitol. So this idea that you could just be in a continuing unlawful assembly and you could be arrested anywhere if you're still with a group of people later on, I don't buy that. I think that oversteps the Constitution in a lot of ways. And I think that that's the attitude that these officers were approaching things with. And it's very problematic. But there are some other fact disputes that Ms. Mechel represents that I think she has the record wrong on. Mr. Neters was not at the Capitol for the dispersal orders. He testified he didn't hear any of them. There's video showing him leaving with Senator Keogh, who was a community leader that took a group away from the Capitol when officers were wanting people to leave. Mr. Neters left with that group. He was not there. He didn't ignore any dispersal order at the Capitol. And that's what is so important here. There were people who did disperse in accordance with the dispersal orders or left even before that. Ted Neters was one of them. And you can't say that just because we find him five blocks later, we can arrest him because other people somewhere else earlier did something illegal. There's not enough to connect him to anyone else doing something illegal. And here, I do think that the fact that his cameras, they're different than just a regular person wearing or having an iPhone out and taking a picture. This is professional equipment that's different in type, and I think that should signal to an officer that there's some first amendment activity going on there. Thank you. Thank you. We appreciate your appearance and arguments. Case is submitted, and we'll issue an opinion in due course.